**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DANTE B.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 20-cv-1104** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey I. Cummings** |
| **KILOLO KIJAKAZI,[1]** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Dante B. ("Claimant") brings a motion to reverse the final decision of the Commissioner

of Social Security ("Commissioner") denying his claim for disability insurance benefits

("DIBs"). The Commissioner brings a cross-motion seeking to uphold the decision to deny

benefits. The parties have consented to the jurisdiction of a United States Magistrate Judge

pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to hear this matter pursuant to 42

U.S.C. §405(g). For the reasons that follow, Claimant's motion to reverse the decision of the

Commissioner, (Dckt. #17), is denied and the Commissioner's motion for summary judgment,

(Dckt. #20), is granted.

**I.      BACKGROUND**

**A.      Procedural History**

On December 10, 2016, Claimant (then thirty-nine years old) filed an application for

DIBs, alleging disability dating back to March 15, 2016. (Administrative Record ("R.")15,

53). His claim was denied initially and upon reconsideration. (R. 15). Claimant filed a timely

---

[1] In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court refers to Claimant only by his first name and the first initial of his last name. Acting Commissioner of Social Security Kilolo Kijakazi has also been substituted as the named defendant. Fed.R.Civ.P. 25(d).

request for a hearing, which was held on July 5, 2018, before Administrative Law Judge ("ALJ")

Matthew Johnson.  (R. 29-64).  On December 12, 2018, the ALJ issued a written decision

denying Claimant's application for benefits.  (R. 12-28).  Claimant filed a timely request for

review with the Appeals Council.  On December 12, 2019, the Appeals Council denied

Claimant's request for review, leaving the decision of the ALJ as the final decision of the

Commissioner.  (R. 1-6).  This action followed.

### B.      The Social Security Administration Standard to Recover Benefits

To qualify for disability benefits, a claimant must demonstrate that he is disabled,

meaning he cannot "engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death, or which

has lasted or can be expected to last for a continuous period of not less than 12 months."  42

U.S.C. §423(d)(1)(A).  Gainful activity is defined as "the kind of work usually done for pay or

profit, whether or not a profit is realized."  20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability

claims.  20 C.F.R. §404.1520.  The SSA first considers whether the claimant has engaged in

substantial gainful activity during the claimed period of disability.  20 C.F.R. §404.1520(a)(4)(i).

At step two, the ALJ determines whether a claimant has one or more medically determinable

physical or mental impairments.  20 C.F.R. §404.1521.  An impairment "must result from

anatomical, physiological, or psychological abnormalities that can be shown by medically

acceptable clinical and laboratory diagnostic techniques."  *Id.*  In other words, a physical

or mental impairment "must be established by objective medical evidence from an acceptable

medical source."  *Id.*; *Shirley R. v. Saul*, 1:18-cv-00429-JVB, 2019 WL 5418118, at *2 (N.D.Ind.

Oct. 22, 2019).  If a claimant establishes that he has one or more physical or mental impairments,

the ALJ then determines whether the impairment(s) standing alone, or in combination, are severe and meet the twelve-month duration requirement noted above.  20 C.F.R. §404.1520(a)(4)(ii).

At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings").  The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  If the claimant's impairments meet or "medically equal" a listing, he is considered disabled and no further analysis is required.  If the listing is not met, the analysis proceeds.  20 C.F.R. §404.1520(a)(4)(iii).

Before turning to the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), or his capacity to work in light of the identified impairments.  Then, at step four, the SSA determines whether the claimant is able to engage in any of his past relevant work.  20 C.F.R. §404.1520(a)(4)(iv).  If the claimant can do so, he is not disabled.  *Id.*  If the claimant cannot undertake his past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform given his RFC, age, education, and work experience.  If such jobs exist, he is not disabled.  20 C.F.R. §404.1520(a)(4)(v).

### C.    The Evidence Presented to the ALJ

After slipping on ice on January 10, 2016, Claimant sustained injuries to his knee and neck and aggravated a pre-existing ankle injury.  (R. 31-32).  Claimant seeks disability benefits based on those injuries, as well as limitations stemming from heart problems, degenerative disc disease of the cervical and lumbar spine, diabetes mellitus, peripheral neuropathy, acute myocardial infarction, obesity, and depression.  He submitted the following relevant evidence to the Commissioner regarding his claims.

3

### 1. Evidence from Treating Physicians

Claimant was referred to treating physician, Divya Agrawal, M.D., following his injury. She regularly examined him throughout the alleged disability period. On April 19, 2016, she reported that Claimant presented with neck pain aggravated by head movement, persistent numbness radiating from his neck down both arms and into his second and fourth digits, mild and tolerable mid back pain, and persistent low back pain. (R. 424). Plaintiff had a positive bilateral straight leg test and MRIs revealed disc protrusions at C3-C4, C4-C5, C5-C6, C6-C7, L3-L4, L4-L5, and L5-S1, with annular tearing at L5-S1. (*Id.*). Dr. Agrawal diagnosed Claimant with a cervical sprain, cervical radiculitis, thoracic sprain, lumbar sprain, lumbar radiculitis, a left knee sprain, knee degenerative joint disease, lumbar disc protrusion, and cervical disc protrusion. Her examination also suggested a double crush injury, and neuropathy related to diabetes. (R. 427).

A few months later, on July 30, 2016, Claimant presented to Franciscan Health Hammond with "left sided chest tightness." (R. 367). Treating provider Bassel Ericoussi, M.D., concluded that Claimant had suffered a heart attack and noted that Claimant had been diagnosed with type II diabetes with complications, essential hypertension, and a sleep disorder. (R. 367-68). Dr. Ericoussi indicated that Claimant suffers from "chronic illness with severe exacerbation" and "illness posing threat to life or bodily function." (R. 368).

Claimant saw doctor Dr. Agrawal again on September 13, 2016. She noted that Claimant continued to experience neck pain, numbness in both arms, weakness, lower back pain, and pain and tingling down the right groin and leg. (R. 493). She also noted that Claimant's cardiologist had cleared him to return to "work conditioning." (*Id.*). In March 2017, Dr. Agrawal administered bilateral epidural steroid injections to Plaintiff for lumbar radiculopathy and lumbar herniated disc. (R. 600, 622-623). Two weeks later, on April 4, 2017, Claimant reported thirty

4

percent relief of his lower back pain and fifty percent improvement in his lower extremity, with some residual but duller symptoms. (R. 664). Despite this improvement, at an office visit in May 2017, Claimant reported continued constant neck pain, and popping and numbness down both arms into the hands, as well as hand cramping while lying on his back. (R. 546).

On July 25, 2017, Dr. Agrawal noted that Claimant continued to present with ongoing and unchanged neck and lower back pain. (R. 675). Claimant's tolerance for daily activities was described as "improving," but remained limited. (*Id.*). According to Dr. Agrawal, Claimant had "plateaued" with both conservative care and therapy. She opined that he had "permanent partial disability" and would "likely require chronic pain management in order for him to safely perform his work duties." (*Id.*). Even so, she found that Claimant could return to work subject to the restrictions identified in the June 2017 functional capacity evaluation ("FCE"), discussed below, and discharged him from her care. (*Id.*).

On January 9, 2018, and February 5, 2018, Claimant met with Beryl Armstrong, a Licensed Clinical Professional Counselor at the Family Christian Health Center. (R. 690-94). Armstrong noted that Claimant was struggling with depression and recommended medication and therapy. (R. 692).

On May 30, 2018, Lokesh Chandra, M.D., saw Claimant for a cardiology appointment. (R. 682). Claimant informed Dr. Chandra that he had been "exercising on and off with mild symptoms," and that he felt healthy. (*Id.*). Dr. Chandra documented normal heart sounds and respiratory effort; a "normal" back with no spinal deformity, tenderness, decreased range of motion, or muscular spasm; normal gait, stance, and swing phase with no antalgic component; normal muscle strength and tone with full range of motion against gravity and resistance; and normal extremities with full range of motion and five out of five muscle strength. (R. 682-83).

## 2.     Evidence from Examining Consultants

On May 6, 2017, Albert Osei, M.D., conducted an examination of Claimant related to his application for benefits.  (R. 511).  Dr. Osei noted Claimant was able to get on and off the table with no difficulty and get up from a sitting position with no difficulty.  (*Id.*).  Claimant presented with decreased range of motion in his cervical spine, as well as normal range of motion in his lumbar spine, negative bilateral straight leg tests, normal range of motion in his upper and lower extremities, normal grip strength, normal ability to grasp and manipulate objects in both hands, and no joint swelling.  (*Id.*).  He could do a toe-heel walk and could walk with a non-antalgic gait for greater than fifty feet.  (*Id.*).  Claimant was unable to squat completely, and his sensation was reduced in the left forearm and fingers.  (*Id.*).  Dr. Osei noted no signs of depression.  (R. 512).

Ryan Stachorek, an assessment specialist with ATI Physical Therapy, completed an FCE on Claimant's behalf on July 20, 2017.  (R. 800-02).  In it, he observed that Claimant demonstrated no apparent limitations when standing and moderate challenges when performing tasks at lower heights due to lower back pain.  (R. 800).  He found Claimant capable of completing an eight-hour workday, during which he could sit for three to four hours (thirty-six minutes at a time), stand for eight hours (no apparent limitations), and walk for eight hours (no apparent limitations).  (R. 801).  Stachorek also found Claimant capable of occasional – meaning one half to two and a half hours per day – balancing and climbing stairs.  (*Id.*).  Claimant was deemed capable of "minimally occasional" – zero to one half hour per day – bending/stooping, crouching, kneeling, and squatting.  (*Id.*).  As for hand use, Claimant was found to be capable of frequent "simple grasps," but only occasional firm and fine grasps.  (*Id.*).  Stachorek recommended that Claimant could "attempt a return to work."  (R. 800).

On October 14, 2017, Efesomwan Aisien, M.D., also examined Claimant in connection with his application for benefits.  (R. 577).  At the time, Claimant could get on and off the exam table with mild difficulty.  (R. 578).  He could walk greater than fifty feet without support and his gait was not antalgic.  He was unable to perform toe-heel walk or squat, but demonstrated normal grip strength, normal limb strength, normal ability to grasp and manipulate objects, and normal range of motion in his upper and lower extremities and in the cervical spine.  (*Id.*).  Claimant's range of motion was reduced in his lumbar spine and his left side straight leg test was positive.  (*Id.*).  Dr. Aisien noted no signs of depression.  (*Id.*).

### 3. Evidence from State Agency Consultants

State agency medical consultant Richard Bilinsky, M.D., reviewed Claimant's file on June 15, 2017.  He found that Claimant could perform light work with frequent climbing of ramps or stairs; occasional climbing of ladders, ropes, or scaffolds; frequent balancing, stooping, kneeling, crouching, and crawling; frequent feeling with the upper left extremity; and no concentrated exposure to extreme cold or heat, vibration, or hazards.  (R. 70).  State agency medical consultant Reynaldo Gotanco, M.D., reached the same conclusions after reviewing Claimant's file on November 3, 2017, except that Dr. Gotanco found that Claimant was capable of only occasional stooping.  (R. 83).

### 4. Evidence from Claimant's Function Reports

Claimant completed a function report on February 20, 2017.  In it, he opined that the numbness in his arms makes it difficult to care for his hair and shave.  (R. 198).  He prepares simple meals daily (like sandwiches) and can do light cleaning on good days.  (R. 199).  When asked whether he has any problems using a phone, he indicated that he has trouble picking up small objects and with writing.  (R. 206).  Claimant completed a second function report on

September 7, 2017, and reported that he can heat already prepared foods, (R. 221), load laundry, (*id.*), and walk for about twelve to fifteen minutes before needing to stop and rest, (R. 224).

### 5.     Evidence from the Hearing

Claimant appeared with counsel at the hearing on July 5, 2018.  When asked why he cannot work, Claimant testified that he is in constant pain, which is typically a five out of ten. He also cited numbness in his hands and feet and shortness of breath.  (R. 39).  The numbness radiates down his neck, through his arms, and into three of his fingers, making it difficult for him to write, type, and hold things.  (R. 43, 46).  Claimant's sciatic nerve problems cause burning and numbness when he sits.  He testified that he can often only sit for twenty to thirty minutes before needing to stand and can sometimes only stand for an hour.  (R. 45).  When in a lot of pain, Claimant lies flat on the floor for forty-five minutes to an hour.  (R. 46).  He usually does this at least three times per day.  On his worst days, he lays down for six to seven hours.  (R. 56).  He elevates his feet above his heart when lying down to reduce swelling and edema.  (*Id.*).  Claimant has swelling in his legs every day.  (R. 48).

Physical therapy helps alleviate pain in Claimant's lower back, but does not alleviate neck and arm pain, or the numbness in his leg.  (*Id.*).  His ability to engage in physical therapy is limited due to his heart problems, as is his ability to take pain medication.  (R. 40).  The most exercise Claimant gets is walking to the end of his driveway.  (R. 41).  His doctors have recommended neck surgery, but Claimant has not pursued the treatment due to fear.  (R. 42).

### D.     The ALJ's Decision

The ALJ applied the five-step inquiry required by the Act in reaching his decision to deny Claimant's request for benefits.  At step one, the ALJ found that Claimant has not engaged in substantial gainful activity since his alleged onset date of March 15, 2016.  (R. 18).  At step

two, the ALJ determined that Claimant suffers from the severe impairments of ischemic heart disease, degenerative disc disease of the cervical and lumbar spine, diabetes mellitus, peripheral neuropathy, prior acute myocardial infarction, and obesity. (*Id.*). The ALJ found that Claimant does not have the medically determinable impairments of depression or gout. (*Id.*).

At step three, the ALJ concluded that Claimant does not have an impairment or combination of impairments that meet or medically equal one of the Commissioner's listed impairments, including listing 1.04 for disorders of the spine, 4.04 for ischemic heart disease, or 11.14 for peripheral neuropathies. (*Id.*). The ALJ noted that he considered the additional and cumulative effects of Claimant's obesity when determining that Claimant does not meet the criteria for any listed impairment. (*Id.*).

Before turning to step four, the ALJ determined that Claimant has the residual functional capacity ("RFC") to perform light work with the following limitations:

> frequent reaching, including overhead, as well as frequent handling, fingering, and feeling bilaterally. He can occasionally climb ramps or stairs, and can never climb ladders, ropes, or scaffolds. He can occasionally balance, stoop, kneel, crouch, and crawl. He can never work in hazardous environments, such as around unprotected heights, near moving mechanical parts, or operate a motor vehicle. He can occasionally work in environments with extreme cold, extreme heat, and vibration.

(R. 18-19). Based on these conclusions, the ALJ determined at step four that Claimant is capable of performing his past work as a "case aide worker" (light per the DOT, medium as performed by Claimant). (R. 22). As such, the ALJ found that Claimant was not disabled. (*Id.*).

## II. STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). "Substantial

evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted). The Commissioner's decision must also be based on the proper legal criteria and be free from legal error. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts, resolving conflicts, deciding credibility questions, making independent symptom evaluations, or otherwise substituting its judgment for that of the Commissioner. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to his conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413.

## III.    ANALYSIS

Claimant makes four overarching arguments in support of remand. He argues that the ALJ failed to: (1) adequately account for his neuropathy-related upper extremity limitations in the RFC; (2) adequately account for his lower extremity limitations in the RFC; (3) adequately account for his non-physical limitations in the RFC; and (4) properly evaluate the findings of his treating physician, Dr. Agrawal. The Court will address each argument in turn.

A. **The manner in which the ALJ incorporated Claimant's neuropathy-related limitations into the RFC is supported by substantial evidence.**

Claimant has neuropathy related to his diabetes, (R. 426), and has consistently reported numbness in his hands, (R. 42, 546, 664). He testified that the sensation is constant and makes it difficult for him to write, type, and hold objects. (R. 46). Relatedly, in the July 2017 FCE, Stachorek, a physical therapist, found that Claimant could engage in frequent "simple grasping," but only occasional "firm" and "fine" grasping. (R. 801). The ALJ declined to rely on this finding, and limited Claimant to frequent – rather than occasional – handling and fingering. Claimant argues that this finding was improper because: (1) it was not supported by the evidence in the record; (2) the ALJ omitted evidence contrary to his conclusion; and (3) the ALJ improperly relied on Claimant's activities of daily living ("ADLs") to discount the FCE findings.

1. **The ALJ cited sufficient evidence to support his finding that Claimant is capable of frequent handling and fingering.**

First, the Court disagrees with Claimant's argument that the ALJ failed to properly support his conclusion that Claimant is capable of frequent handling and fingering. (Dckt. #17 at 8). The ALJ cited the findings of two consultative examiners (Drs. Osei and Aisien) indicating that Claimant had normal grip strength and normal ability to grasp and manipulate objects in both hands – (R 20) (citing R. 511, 578) – as well as multiple notes evidencing Claimant's normal musculoskeletal range of motion – (R. 20) (citing R. 511, 578, 683). The ALJ repeatedly acknowledged Claimant's complaints of numbness, hand paresthesia, and diminished sensation, (R. 19, 20), as well as record evidence revealing degenerative changes and neuropathy, (R. 21), including each exhibit cited by Claimant. *See* (R. 19) (addressing the March 2016 imaging and the April 2016 EMG testing). Together, this evidence led the ALJ to impose *greater* limitations on handling and fingering than those recommended by state agency consultants Drs. Bilinsky

11

and Gotanco. (R. 21) (affording only partial weight to these opinions because "the consistent pain complaints throughout the record, including at the hearing level, justify additional postural and reaching limitations"). In light of this evidence, the Court can trace the path of the ALJ's reasoning from the record to the RFC. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning") (quotations and citation omitted). Accordingly, the Court finds that substantial evidence supports his decision.

> **2.     Claimant has not shown that the ALJ omitted evidence that conflicts with his neuropathy-related findings from the RFC assessment.**

In response to Claimant's argument that the ALJ omitted "dire details" that corroborate his complaints regarding neuropathy symptoms, (Dckt. #17 at 9), the Commissioner concedes that the ALJ misstated the number of levels of disc dehydration in Claimant's spine documented in a March 2016 MRI. (Dckt. #21 at 10) (citing R. 497-500). Although this mischaracterization of the record was an error, the Court agrees with the Commissioner that it was a minor one. Comparatively, the ALJ's decision not to recount every detail from the March 2016 MRI and the April 2016 EMG does not constitute an error at all given that an ALJ "is not required to address every piece of evidence or testimony presented," *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), so long as he does not ignore evidence contradicting his conclusions, *Idoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2009).

Here, the ALJ addressed the key findings from the March 2016 MRI and the April 2016 EMG: namely, that the imaging shows "reversal of the cervical spine curvature, disc dehydration at C2-C3, C6-C7, L3-L4, and L5-S1, multiple disc protrusions, and bilateral neural foraminal stenosis." (R 19). Claimant does not show how any evidence omitted from the ALJ's analysis

regarding disc protrusions, effacement of the thermal sac, bilateral neuroforaminal narrowing, or the exact levels of disc dehydration would support greater limitations than those ultimately found by the ALJ. Accordingly, the ALJ's misstatement of which discs were dehydrated and failure to relay the results of Claimant's medical imaging in their entirety do not require reversal.

### 3. Any arguable error in the ALJ's reliance on Claimant's ADLs to reject the FCE finding regarding Claimant's handling abilities was harmless.

In addition to the evidence cited above, *see* Section III(A)(1), *supra*, the ALJ also relied on Claimant's ADLs to discount the FCE's more restrictive finding regarding Claimant's handling and fingering abilities. (R. 22). While it is appropriate for ALJs to consider whether a claimant's activities are consistent with medical opinions, they must also address any "qualifications as to *how* [the claimant] carried out those activities." *Craft*, 539 F.3d at 680 (finding the ALJ impermissibly relied on the claimant's ability to take walks, clean his apartment, and shop for groceries without acknowledging that the claimant's "so-called 'daily walk' was merely to the mailbox at the end of the driveway, his vacuuming took only four minutes, and his grocery shopping was done on a motorized cart at the store and he was able to carry only one grocery bag in each hand into the house.") (emphasis in original).

In this case, the ALJ did not consider the qualifications as to how Claimant carried out his ADLs. For example, the ALJ found that the FCE's limitation to firm and fine grasping was inconsistent with Claimant's ability to prepare meals, (R. 22), but he failed to address Claimant's testimony that he can only prepare simple meals, (R. 199), has difficulty using kitchen tools due to numbness, (R. 206), and struggles to open jars and packages of food, (*Id.*). This shortcoming renders this portion of the ALJ's analysis incomplete and arguably erroneous. *See Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) ("[A]lthough an ALJ does not need to discuss every

piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it.").

Even if the ALJ erred in this respect, however, an "administrative error may be harmless" and courts "will not remand a case to the ALJ for further specification where [they] are convinced that the ALJ will reach the same result." *McKinzey*, 641 F.3d at 892; *see also Karr*, 989 F.3d at 513. Here, the Court finds that any error related to the ALJ's analysis of Claimant's handling and fingering limitations was harmless because Claimant's past work as a "case aide worker" – which the ALJ concluded that Claimant is capable of performing, (R. 22) – requires only *occasional* reaching, handling, and fingering. *See* Dictionary of Occupational Titles, DICOT 195.367-010, 1991 WL 671595. Thus, even if the ALJ had adopted the limitations recommended in the FCE, his ultimate finding of disability would have remained the same. *See Plant v. Colvin*, No. 2:13-cv-489, 2015 WL 1931337, at *9 (N.D.Ind. Apr. 28, 2015) (finding that any error in articulating the RFC was harmless where the VE identified jobs for someone with claimant's RFC that could also be performed by someone with the additional limitations posed by claimant); *Wilhelm v. Colvin*, No. 1:13-cv-323, 2015 WL 926010, at *6 (N.D.Ind. Mar. 4, 2015) (ALJ's failure to find sinusitis to be a medically determinable impairment was harmless where "claimant would still be able to perform the identified jobs, even with added restrictions [to address sinusitis]"). Claimant does not assert that he is incapable of *occasional* handling and fingering and no medical professionals in the record have suggested a more restrictive limitation.

### B. The ALJ did not commit reversible error in his analysis of Claimant's lower extremity limitations.

Claimant next presents various arguments regarding the ALJ's assessment of his lower extremity limitations. He first asserts that "evidence the ALJ omitted from his narrative" would require greater limitations stemming from Claimant's lower back and lower extremity

14

impairments. (Dckt. #17 at 11). Claimant fails, however, to specify what evidence the ALJ omitted or explain why that omitted evidence would support a more restrictive RFC. Accordingly, this argument is waived. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made it clear that perfunctory and undeveloped arguments . . . are waived."); *see also Carter v. Astrue*, 413 Fed.Appx. 899, 906 (7th Cir. 2011) (finding claimant waived argument that the ALJ overlooked the side effects of his medications when he failed to specify which side effects she ignored).

Claimant next argues that the ALJ: (1) failed to explain how medical images of Claimant's spine were consistent with the RFC assessment; (2) failed to adequately explain his findings regarding Claimant's ability to crouch and stoop; (3) failed to explain how the objective evidence was inconsistent with Claimant's subjective complaints; (4) improperly analyzed evidence related to Claimant's improvement; (5) failed to consider how Claimant's obesity would affect his RFC; and (6) failed to build a logical bridge between the evidence and his findings regarding Claimant's ability to walk. The Court will address these arguments in turn.

### 1. The ALJ's analysis of medical imaging of Claimant's spine was adequate.

Claimant again criticizes the ALJ's assessment of the March 2016 MRI, this time as it relates to his analysis of Claimant's lower extremity limitations. Claimant suggests that the ALJ offered only "perfunctory and seemingly benign descriptions" of the report, "glossed over" several of its findings, and failed to mention that the MRI revealed an annular tear at L5-S1. (Dckt. #17 at 12). Again, an ALJ "is not required to address every piece of evidence or testimony presented." *Terry*, 580 F.3d at 475. Because the ALJ observed that the March 2016 MRI showed disc dehydration, multiple disc protrusions, and bilateral neural foraminal stenosis, (R 19), and because Claimant does not suggest how the omitted evidence regarding an annular

tear would support greater limitations than those found by the ALJ, Claimant's argument that the ALJ improperly omitted or assessed the MRI evidence is unsupported.

### 2.      Claimant's argument regarding his crouching and stooping capabilities misstates the ALJ's findings.

Claimant next argues that the ALJ failed to explain how Claimant would be able to frequently crouch and stoop.  (Dckt. #17 at 12).  As noted by the Commissioner, however, the ALJ found that Claimant could *occasionally* – not frequently – crouch and stoop.  (R. 19). Furthermore, even if the ALJ's finding as to Claimant's ability to crouch and stoop was flawed, any such error was harmless because the job of case aide worker does not require crouching or stooping.  *See* Dictionary of Occupational Titles, DICOT 195.367-010, 1991 WL 671595.

### 3.      The ALJ's analysis of Claimant's subjective complaints was not patently wrong.

Claimant suggests that the ALJ failed to explain how the record is inconsistent with his subjective complaints, such as his allegation that he needs to lie on the floor for thirty minutes to an hour several times a day.  (Dckt. #17 at 12).  Again, the Court disagrees.

An ALJ's credibility determinations are entitled to special deference and will only be overturned if patently wrong.  *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017). "[P]atently wrong . . . means that the decision lacks *any* explanation or support."  *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (emphasis added) (citation omitted).  Here, the ALJ cited Claimant's allegations regarding the extent of his lower extremity limitations – including the fact that lying on the floor helps relieve his pain – but found that they were inconsistent with the findings of state agency consultants, treatment notes from Claimant's physicians, and the FCE.  (R. 20-22).  Accordingly, Claimant's argument amounts only to an invitation to reweigh

the evidence, which the Court will not do.[2]  *See Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021) ("We will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination so long as substantial evidence supports it."); *Lacher v. Saul*, 830 Fed.Appx. 476, 478 (7th Cir. 2020) ("The ALJ's rationale here was thin, but it was adequate to reflect her conclusion that the objective medical evidence and Lacher's daily activities did not corroborate his subjective symptoms.").

### 4.      The ALJ properly considered evidence of Claimant's improvement.

Claimant asserts that the ALJ improperly handled evidence related to the improvement of his impairments.  (Dckt. #17 at 13).  In making this argument, however, Claimant mischaracterizes the ALJ's findings.  Contrary to Claimant's assertions, the ALJ never suggested that his coronary symptoms had "disappeared" or that his back impairments had been "cured." Instead, the ALJ accurately cited records in which Claimant described his coronary artery symptoms as "mild," (R. 20) (citing R. 591), and reported thirty percent relief of his lower back pain and fifty percent improvement in his lower extremity symptoms, (R. 20) (citing R. 664).

And while Claimant is correct that the relevant question is not whether he has improved, but whether he can sustain full time employment, improvement *is* a relevant factor that ALJs may consider.  The Seventh Circuit explicitly noted as much in the very case cited by Claimant. *See Murphy*, 759 F.3d at 819 ("The key is not whether one has improved (*although that is*

---

[2] Claimant takes particular issue with the ALJ's discussion of Claimant's allegations related to leg swelling.  (Dckt. #17 at 12).  However, the ALJ acknowledged Claimant's assertion that his legs swell daily and noted that Claimant went to the hospital due to leg swelling in August 2017.  (R. 20).  The ALJ also observed that: (1) records from January 19, 2016, through September 11, 2017, indicated that Claimant had *no* edema symptoms, (R. 20) (citing R. 708, 713, 719), and (2) no treating provider had recommended that Claimant use compression stockings or elevate his lower extremities to combat swelling.  The ALJ reasoned that this evidence indicated that Claimant's leg swelling was not a daily occurrence or as severe as Claimant alleged.  (R. 20).  This was a reasonable interpretation of the record and nothing more is required under the applicable standard of review.  *See Elder*, 529 F.3d at 413.

*important*), but whether they have improved enough to meet the legal criteria of not being classified as disabled") (emphasis added).  Here, the ALJ properly considered Claimant's improvement alongside other evidence, (*see, e.g.,* R. 21), to support his finding that Claimant had not only improved, but was capable of work.

### 5. The ALJ adequately supported his findings regarding Claimant's ability to sustain the walking requirements of light work.

Fifth, Claimant argues that it is unclear how the ALJ "jumped from a vague finding that Plaintiff could walk more than [fifty] feet in a doctor's office to a finding that he could sustain the considerable walking requirements of light work." (Dckt. #17 at 13).  As the Commissioner notes, however, the ALJ cited substantial additional evidence supporting his finding regarding Claimant's capacity for walking, including: (1) Dr. Osei's May 2017 findings that Claimant had a full range of motion in his joints and lumbar spine and full strength in all extremities, (R. 20) (citing R. 511); (2) Dr. Chandra's May 2018 finding that Claimant had a normal gait and five out of five muscle strength, (R. 20) (citing R. 682); (3) the findings of state agency medical consultants Drs. Bilinsky and Gotanco that Claimant can perform light work, (R. 21) (citing R. 73, 86); and (4) the FCE finding that Claimant can stand or walk for eight hours with no apparent limitations, (R. 22) (citing R. 801).  This is a sufficient basis for the ALJ's finding and the Court cannot displace the ALJ's judgment by reweighing the evidence.

### 6. The ALJ did not commit reversible error by failing to explicitly factor Claimant's obesity into the RFC analysis.

Finally, Claimant argues that it is "inconceivable" that an obese individual with his combination of impairments "would be able to sustain the exertional requirements of light work." (Dckt. #17 at 13-14).  This argument, which lacks any legal support, is undeveloped and unduly speculative.  *See, e.g., Shaun R. v. Saul*, No. 18 C 4036, 2019 WL 6834664, at *9

18

(N.D.Ill. Dec. 16, 2019) (rejecting argument where "plaintiff's brief says that it is hard to believe that someone who is 5'6" and weighs 250 would be able to work" as "undeveloped, unsupported by caselaw, and . . . rank speculation").

In any event, an ALJ's failure to explicitly consider the effects of obesity is harmless when: (1) the ALJ adopts the limitations suggested by specialists and reviewing doctors who were aware of the condition; and (2) when the claimant fails to "specify how his obesity further impaired his ability to work." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("[A]lthough the ALJ did not explicitly consider Skarbek's obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions."); *see also Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006) (Because Prochaska failed to "specify how [her] obesity further impaired [her] ability to work," and because the record relied upon by the ALJ sufficiently analyzes her obesity, any error on the ALJ's part was harmless."). Here, because the ALJ relied on the opinions of medical professionals who were aware of Claimant's condition – *see* (R. 65) (file reviewed by state agency consultant listing Claimant's height, weight, and BMI) – and because Claimant fails to identify evidence suggesting greater limitations caused by his obesity, any error regarding the ALJ's consideration of the effects of Claimant's obesity would have been harmless.

### C. The ALJ properly found that Claimant's alleged depression was not medically determinable.

At step two of the analysis, the ALJ acknowledged that Claimant had undergone counseling for depression in January 2018. (R. 18). However, because Claimant's depression was not diagnosed by an acceptable medical source under the regulations, the ALJ found that it was not medically determinable. (*Id.*). Claimant now contests the ALJ's assertion that he was not diagnosed by an acceptable medical source. (Dckt. #22 at 1).

19

Claimant was diagnosed with depression by Beryl Armstrong, LCPC. (R. 691); (*see* Dckt. #22 at 1 (identifying her as an LCPC)). Because Armstrong is a "Licensed Clinical Professional Counselor" – and not, contrary to Claimant's suggestion (Dckt. #22 at 1), a licensed or certified psychologist – the ALJ was correct to conclude that she does not constitute an acceptable medical source under the regulations.[3] *See* 20 C.F.R. §§404.1502(a)(1)-(5) (limiting acceptable medical sources to licensed physicians, licensed psychologists, and other professions not relevant to this analysis); *see also Ellen B. v. Saul*, No. 19-cv-2389, 2020 WL 1912228, at *8 (N.D.Ill. Apr. 20, 2020) (LCPC not an acceptable medical source); *Compton v. Colvin*, No. 11 C 8305, 2013 WL 870606, at *10 (N.D.Ill. Mar. 7, 2013) (same). Because LCPC Armstrong is not an "acceptable medical source," Claimant's depression is not "medically determinable" and the ALJ's finding to this effect is well-founded. *See* 20 C.F.R. §§ 416.921, 404.152 (medically determinable impairments "must be established by objective medical evidence from an acceptable medical source"), as was his decision not to consider Claimant's non-physical limitations in the RFC assessment. *See* 20 CFR § 404.1529(d)(4); SSR 96-8, 1996 WL 374184 (June 2, 1996) ("The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms.").[4]

---

[3] Claimant's reply brief suggests that Armstrong is also a National Certified Counselor ("NCC") and a Certified Clinical Telemental Health Provider ("CTMH"). (Dckt. #22 at 1). It is unclear where Claimant found these post-nominal titles, as they are not in the records provided by Armstrong, (R. 691-94). Regardless, none of these titles would render Armstrong an acceptable medical source, per the applicable regulations.

[4] Claimant seems to suggest that his alleged need to lie down throughout the day equates to an inability to concentrate. (Dckt. #22 at 2) ("[T]he ALJ did not account for the off-task time (and, as such, failure to concentrate) that would be attributable to Plaintiff's need to lie down for 45 minutes periodically throughout the workday."). However, Claimant alleged that he needed to lie down due to physical pain, not difficulty concentrating. Therefore, the ALJ was not obligated to assess concentration-related limitations in the RFC. *Lemerande v. Berryhill*, No. 17-C-190, 2018 WL 1061462, at *7 (E.D.Wis. Feb.

**D.      The ALJ properly assessed the records of Claimant's treating physician.**

Finally, Claimant argues that the ALJ improperly rejected the July 26, 2017 finding of

Dr. Agrawal that Claimant has a "permanent partial disability."  Once again, the Court disagrees.

As the ALJ reasoned – and as Claimant admits, (Dckt. #17 at 15) – the ultimate finding of

disability is reserved to the Commissioner.  *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

Accordingly, the ALJ rightly dismissed this conclusory statement by Dr. Agrawal.

Claimant's argument that the ALJ shirked his obligation to "assess the basis" for Dr.

Agrawal's disability finding is also incorrect.  Again, an ALJ is not required to address every

piece of evidence presented by a claimant, so long as he does not ignore an *entire line* of

evidence that contradicts his findings.  *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

Here, there was nothing in Dr. Agrawal's July 26, 2017 report that contradicted the ALJ's

conclusion that Claimant is capable of work.  In fact, notwithstanding her note that Claimant

suffered from a "permanent disability," Dr. Agrawal found Claimant could "[r]eturn to work

with restrictions as per Functional Capacity Evaluation."  (R. 675).  These findings, which may

seem contradictory, underscore the differences between the medical and legal definitions of

"disability."

The Court also notes that, while the ALJ narrowed his discussion of Dr. Agrawal's July

26, 2017 report to her improper finding of disability, he assessed similar treatment notes by Dr.

Agrawal elsewhere in the RFC.  In particular, the ALJ cited Dr. Agrawal's observations that

Claimant continued to struggle with hand paresthesia, diminished sensation in the fingers, neck

and lower back pain, and mildly positive straight leg tests.  (R. 20) (citing R. 546, 664).  Far

from ignoring these remarks, the ALJ relied on them to impose greater limitations than those

---

26, 2018) (if a claimant does not allege a limitation, the court will not fault the ALJ for "failing to create
limitations of [his] own").

suggested by state agency consultants. (R. 21); *see* Section III(A)(2), *supra*. Accordingly, the ALJ not only properly assessed Dr. Agrawal's findings, but incorporated them into his RFC determination.

## CONCLUSION

For the foregoing reasons, Claimant's motion to reverse the decision of the Commissioner, (Dckt. #17), is denied and the Commissioner's motion for summary judgment, (Dckt. # 20), is granted. The decision of the ALJ is affirmed.

**ENTERED:   August 31, 2022**

_____

**Jeffrey I. Cummings**

**United States Magistrate Judge**